

**SO ORDERED.**

**SIGNED this 28 day of February, 2018.**

**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## NEW BERN DIVISION

IN RE:

                          **CASE NO.**

**JOSEPH F. WIGGINS**                **16-05606-5-JNC**
**GLORIA H. WIGGINS**            **CHAPTER 11**

        **DEBTORS**

### ORDER VALUING PROPERTY

An evidentiary hearing to value certain real property for purposes of confirmation of the Debtors' chapter 11 plan of reorganization was conducted on January 23-25, 2018 in Greenville, North Carolina. This order explains the reasoning behind and confirms the court's ruling from the bench that the value of the Property (as defined below) is $445,000 for purposes of chapter 11 plan confirmation.

### BACKGROUND

Joseph F. Wiggins and Gloria H. Wiggins (the "Debtors") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 27, 2016. This is their second chapter 11 proceeding in this district, the first case having been filed on September 26, 2011 (Case No. 11-07316-8-SWH; the "First Case"), and the Debtors' chapter 11 plan having been confirmed in the First Case on June 26, 2012. *See* First Case Dkt. 132 (June 26, 2012) (the "First Plan"). Branch

Banking & Trust Company ("BB&T") was the primary and largely secured creditor in the First Case. The Debtors defaulted on their obligations to BB&T under the First Plan, and on February 10, 2014, BB&T assigned all of its rights against the Debtors, including the underlying debt instruments, claims, and rights under the confirmed First Plan to Commercial Funding Solutions, LLC ("CFS"). Subsequently, CFS sought to collect upon its assigned collateral, ultimately leading to the filing of the instant chapter 11 petition.

CFS filed a proof of claim in this case in the total amount of $1,674,916.41, Claim No. 4, consisting of two notes secured by four tracts of real property owned by the Debtors (including the Property) and certain personal property. The First Plan provided that the notes would remain cross-collateralized, and note modification agreements were executed as contemplated in the First Plan. *See* Dkt. 221 at 8, ¶ 20. The proposed plan in this case, among other things, provides for the surrender of certain real estate collateral (the "Property") to CFS in a partial "dirt-for-debt" exchange. CFS opposed the plan as originally submitted.

The parties participated in a mediated settlement conference on August 2, 2017 in an effort to resolve their disputes, including the treatment of CFS's claim under the chapter 11 plan proposed in this case. The parties resolved all disputes in the present case with the exception of the valuation of the Property to be surrendered to CFS. The parties agreed to submit to the court the question of valuation and corresponding credit due, after which the Debtors' proposed plan in this case may be considered for confirmation. The Settlement Agreement was approved by the court on January 22, 2018, Dkt. 217. The hearing in this matter was scheduled and the parties submitted a series of stipulations in a Joint Pre-Hearing Order entered on January 23, 2018, Dkt. 221.

**"DIRT FOR DEBT"**

Pursuant to the Settlement Agreement, the parties agreed that the court would conduct a valuation hearing pursuant to 11 U.S.C. § 506 to determine the value of the Property and whether the Property constitutes the "indubitable equivalent" of the CFS claim, or any portion thereof. *See* Dkt. 221 at 15, ¶ 2. Accordingly, the court begins with a review of the applicable standards and formula for determining "indubitable equivalent" where a party seeks to surrender only a portion of a secured creditor's collateral. While the confirmation hearing has been bifurcated in this case, the standards for the proposed plan treatment are applicable here because the court's determination will be used to confirm the Debtors' plan in a separate proceeding as contemplated by the Settlement Agreement.

To achieve confirmation, a proposed plan must be "fair and equitable" with respect to each impaired class that has not accepted the plan. 11 U.S.C. § 1129(b)(1). An objecting secured creditor's treatment may be deemed fair and equitable if the treatment satisfies one of the three criteria set forth under § 1129(b)(2)(A), which requires that with respect to secured claims such as CFS's, the plan must provide:

> (i)  (I)  that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II)  that the holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii)  for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
>
> (iii)  for the realization by such holders of the indubitable equivalent of such claims.

§ 1129(b)(2)(A). The parties agree that the court's valuation will determine whether the Debtors' surrender of the Property constitutes the indubitable equivalent of some or all of CFS's claim for purposes of 11 U.S.C. § 1129(b)(2)(A)(iii).

This district has seen more than its share of "dirt-for-debt" cases and, as a result, a long line of opinions explaining the fundamentals and methodology has developed. Most recently, Judge Humrickhouse detailed the history and analysis of "dirt-for-debt" in *In re Bate Land & Timber, LLC*, 523 B.R. 483 (Bankr. E.D.N.C. 2015), *aff'd, Bate Land Co. LP v Bate Land & Timber LLC (In re Bate Land & Timber LLC)*, 877 F.3d 188 (4th Cir. 2017), where she explained:

> The "indubitable equivalent" evaluation is a particularly challenging component of dirt-for-debt cases in that the court must take guidance from multiple policies and procedures, and because precedent on this point conflicts. The starting line, at least, is clear: A bankruptcy court tasked with the responsibility of determining whether a debtor's proffered surrender of collateral provides a creditor with the indubitable equivalent of its claim must take the amount of the creditor's secured claim as its starting point, then set it against the present value of the property to be surrendered, which value the court must determine based on a conservative approach to valuation and the circumstances of the case.

523 B.R. at 497 (citing *In re Bath Bridgewater S., LLC*, Case No. 11-06817-8-SWH, 2012 WL 4325650, at *4 (Bankr. E.D.N.C. Sept. 20, 2012) (noting that the first step in the analysis is the setting of the claim)).

Further, "[i]t generally is understood that when a secured creditor receives *all* of the property to which its lien attaches, the creditor has received the full value – the 'indubitable equivalent' – of its monetary claim, because 'common sense tells us that property is the indubitable equivalent of itself.' . . . When a debtor's plan calls for surrender of *a portion* of the property in full satisfaction of the debt, however, the assessment becomes more complicated." *Id.* (citing *Matter of Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1350 (5th Cir. 1989)).

4

Here, the parties acknowledge that the surrender of the Property will not satisfy CFS's claim in full, but, as in *Bate, Bath Bridgewater*, and multiple other cases, they strenuously disagree concerning the amount of credit to be given. They have submitted competing appraisals that reach markedly different values for the Property. An extreme valuation difference may preclude effective valuation. "[T]he court is well aware that widely differing appraisals can serve as a red flag, signifying uncertainty with respect to some component of valuation." *Bate*, 523 B.R. at 499 (citing *Bannerman II*, Case No. 7:11-CV-00009-H (E.D.N.C. Sept. 30, 2011) (slip op.) (concluding that "[t]he wide-ranging valuations presented to the bankruptcy court, even among [the creditor's] own appraisers, are indicative of the uncertainty in the value of this particular property," and therefore "weigh against a finding of indubitable equivalence"), and *In re SUD Props., Inc.*, Case No. 11-03833-8-RDD, 2011 WL 5909648, at *11 (Bankr. E.D.N.C. Aug. 23, 2011) (concluding that a "large disparity in professionally appraised values demonstrate[d] uncertainty in attempting to forecast the price at which the Property will sell," such that "[t]oo much variation in values and too much uncertainty in the market equals no indubitable equivalent")).

However, here the parties have agreed to the exchange of real estate for claim credit, and only the amount remains at issue. In such situations, the court must step in and determine a proper valuation, as noted by Judge Humrickhouse in *Bate*:

> The extreme differential does not, however, preclude valuation. It is a fact that the properties have a fair market value.  It is also a fact that determining what that value is, can be difficult. A third fact is this: The court has a duty to value property pursuant to § 506, that duty is not limited to those instances where valuation is easy or uncontested, and that duty encompasses those instances where the economy is uncertain and comparable sales are scarce. The fact that two appraisers have arrived at vastly different values cannot relieve the court of its obligation. Therefore the court will determine a fair market value number for the property offered for surrender in the debtor's plan in satisfaction of § 506.

*Bath Bridgewater*, Case No. 11-06817-8-SWH, 2012 WL 4325650, at *4.

5

Ultimately, when value must be derived, "[w]hat matters is not the mere existence of widely varying appraisals, but rather the *reasons* for those variations. For example, the parties may disagree on the highest and best use of the property, such that the appraisals reflect their apples-to-oranges view of the scenario, as in the instant case. Or, wide variances can be the byproduct of different appraisers' methodologies, or appraisers' differing choices in how to categorize certain parcels of real property." *Bate*, 523 B.R. at 499. "When two appraisal reports conflict, a court 'must determine the value based on the credibility of the appraisers, the logic of their analyses and the persuasiveness of their subjective reasoning.'" *In re Sailboat Props., LLC*, Case No. 10-03718-8-SWH, 2011 WL 1299301, at *6 (Bankr. E.D.N.C. March 31, 2011) (quoting *In re Atlanta S. Bus. Park, Ltd.*, 173 B.R. 444, 450 (Bankr. N.D. Ga. 1994)) (internal citations omitted).

Here, the reason for the widely varying values lies with the differing opinions on the highest and best use of the Property. The appraisers agreed on how highest and best use is to be determined, but disagreed on the result of the application of the relevant formula. This court employs the three-step "highest and best use" inquiry employed by the court in *In re Peerman*, 109 B.R. 718 (Bankr. W.D. Tx. 1989): physical possibility, legal permissibility and financial feasibility. *See Bate,* 523 B.R. at 501; *In re Sailboat Props., LLC*, No. 10-03718-8-SWH, 2011 WL 1299301, at *2. Indeed, the appraisers agree that a variety of uses are supported by the two prongs of physical possibility and legal permissibility, but diverge in their analysis of financial feasibility.

Finally, the court notes that the Debtors have the burden of proving by the preponderance of the evidence "all aspects of a bankruptcy court's consideration of whether to confirm a debtor's plan under 1129." *Bate*, 523 B.R. at 491. Here, as noted, the only issue for the Debtors to establish is whether the value of the Property to be surrendered is the "indubitable equivalent" of some or all of CFS's claim.

6

## THE EVIDENCE PRESENTED

The Property can be described generally as three contiguous tracts of land totaling approximately 101.26 acres located on Old Comfort Highway in Trenton, Jones County, North Carolina. The evidence presented at the hearing shows that the Property contains approximately 16.70 acres of wooded area and approximately 84.56 acres currently used for agricultural crop production.[1] *See* Ex. 3 at 21. In addition, a road-frontage portion of the Property was previously subdivided into eight lots, with two minor subdivision plats approved and recorded in Jones County. Dkt. 221 at 13, ¶¶ 14-15. In October 2010 and January 2011, six of those lots were sold to American Homesmith, LLC, which built single-family residences on the purchased lots that were subsequently sold to consumers. *Id.* The Wigginses still own two of the vacant platted lots, which are included within the Property. At the time of the Settlement Agreement, the Debtors claimed to have at least preliminary approval from Jones County of an expanded subdivision plat adding an additional 29 perimeter lots (for a total of 37) along Old Comfort Highway. *Id.* at 14, ¶ 17. Also at the time of the Settlement Agreement, the Debtors had obtained a preliminary lot sketch for development of the entire Property into 139 single-family lots.[2] *Id.* at 14, ¶ 18. Except for the six lots sold to American Homesmith, the entire Property remains unimproved and without infrastructure. *Id.* at 13-14, 13, ¶ 16.

---

[1] The court relies upon the appraisal conducted by Earl M. Worsley, Jr., Ex. 3, for the general description of the Property, and notes that the appraisal conducted by Karen L. Cross, Ex. 1, describes the Property as 31 lots (totaling 15.40 acres) plus 61.85 acres of "excess land" including 16.02 acres of wetlands.

[2] Neither of these plats have been recorded. The parties stipulated that the fact that the plats have not been recorded would not be argued in connection with the valuation hearing, and the court makes no inferences one way or the other from this fact.

The following evidence was presented with respect to the use and value of the Property:

**Karen L. Cross**

Karen L. Cross is a licensed real estate appraiser. The parties stipulated that she is an expert in the field of real estate valuation. Dkt. 221 at 14, ¶ 19. Ms. Cross prepared two appraisal reports of the Property: the first report, dated January 18, 2017, was presented as Exhibit 1, and the second, dated June 12, 2017, was presented as Exhibit 2. Exhibit 1 values the Property as the 31 proposed residential lots plus 61.85 acres of excess land, while Exhibit 2 values the Property as 81.92 acres of "developable acreage," providing an "as-is" current value and an "at completion" future value with 139 single-family lots. The Debtors submit that the value described in Exhibit 1 is the correct value for the Property for purposes of the dirt-for-debt exchange, and that Exhibit 2 was submitted to support Ms. Cross's conclusion that residential development is the highest and best use for the Property as described in Exhibit 1.

Ms. Cross's analysis of highest and best use appears at pages 31-33 of Exhibit 1. She considered the four accepted factors for determining highest and best use: physically possible, legally permissible, financially feasible, and most profitable.[3] In her report, Ms. Cross detailed her findings that use of the Property for residential development meets the four criteria for highest and best use, and highlighted her report's conclusions in her testimony. She further testified that she considered other uses, including agricultural, but she did not include that analysis in her report. She rejected agricultural use as the highest and best use due to the nature of the market, stating and concluding that the area is "ripe for development."

---

[3] As noted by Judge Humrickhouse in *Bate*, the fourth factor, most profitable (sometimes denominated "maximum productivity"), is often folded into the third, financially feasible. *See Bate*, 523 B.R. at 502 n.19.

8

As noted above, the appraisers both agreed that residential development is both physically possible and legally permissible, but they diverged in their determinations of financial feasibility. Accordingly, the court will focus on the reasoning both employed for their conclusions related to that factor.

Ms. Cross defined her relevant market area as Jones and Onslow County "due to their close proximity." Ex 1 at 15. She testified that the market area spans 17 miles into Onslow County. "The majority of Jones County is predominantly a rural area where the local economy is driven by farming activities and smaller industrial uses. Most residents of Jones County commute daily to the nearby cities of Richlands, Jacksonville, New Bern and Kinston." *Id.* The Property is less than 3 miles from the Onslow County line to the south. She noted that the Property is in a "historically rural community that is seeing higher levels of growth because of its affordability, lower tax rates, reasonable land costs, proximity to the military bases, and the general growth of Onslow County to the south due to its large military and civilian contractor presence." Ex. 1 at 20. The Property is 30-45 minutes by automobile from the main gate to Camp Lejeune.

Ms. Cross described the Property as "located in a gentrifying mixed-use neighborhood that has seen a steady growth of residential and commercial uses over the last several years due to its good location and proximity to Camp Lejeune and other associated nearby military bases." Ex. 1 at 31, 32. Further,

> [t]here is still strong demand for residential uses in this area of southern Jones County due to its close proximity to Onslow County. The subject is in close proximity to Richlands as well as Trenton and has access to daily conveniences, such as the Walmart in Richlands and the majority of the retail and commercial offerings along NC Highway 24/258, which is a desirable component that purchasers of residential property require. . . . There continues to be a strong demand for new residential projects of this nature due to the proximity to the military bases.

Ex. 1 at 31.

Finally, Ms. Cross supported her findings that the use of the Property for residential development is financially feasible by comparing three competitive developments in northern Onslow County (two near Richlands, the third between Richlands and Jacksonville) and, to a lesser degree, a fourth development near Richlands, which she concluded demonstrated an annual absorption rate for lots and lot/home packages of 23.74%. Ex. 1 at 32. Her suggested absorption rate information is summarized as follows:

| Development | 2014 | 2015 | 2016 | Total Annual Sales | Avg. Annual Absorption |
|---|---|---|---|---|---|
| Cottages at Petersburg | 5 | 4 | 8 | 17 | 5.66% |
| Canons Edge | 52 | 58 | 27 | 137 | 45.66% |
| Bradford Estates | 30 | 29 | 39 | 98 | 32.66% |
| Indigo Ridge | N/A | 5 | 17 | 22 | 11.00% |
| | | | | | |
| Avge. Annual absorption rate | 29 | 24 | 23 | 69 | 23.74% |
| Total Annual Sales | 87 | 96 | 91 | 274 | |

Ex. 1 at 32. Based on this analysis, Ms. Cross estimated that the 31 lots on the Property could be absorbed over 24 months, with 7 lots sold in the first 6 months, 8 sold in the second 6 months, 8 in the third 6 months, and the remaining 8 in the last 6 months. Ex. 1 at 33.

Ms. Cross then conducted a sales comparison to residential lots in three of the four subdivisions: Canon's Edge, Bradford Estates, and Indigo Ridge. After adjusting for superior locations for each subdivision, as well as adjusting for superior home sizes and features (Canon's Edge), superior amenities (Bradford Estates), and superior development appeal (Indigo Ridge and Bradford Estates), Ms. Cross concluded that the market value per lot for the Property is $22,500, leading to a total "gross sellout" value for the 31 lots of $697,500. Ex. 1 at 58.

Ms. Cross next applied an income approach to the 31 lots, utilizing her absorption rate analysis, a discount rate of 10%, a 5% expense for marketing and administrative expenses, a

10

$47/lot annual tax levy, and a developer's profit of 12.09% to reach an "at completion" value of the 31 developed lots of $515,000. Ex. 1 at 64.  "This value is built around the assumption that the project is completed, thus the value is of that point in time." *Id*.

With respect to the approximately 61.85 acres of "excess land," Ms. Cross employed the sales comparison approach. Her comparisons included 5 tracts, one of which is a listing while four are sales. Comparable number 1 is a listing for property on Comfort Road in Richlands that has been on the market since April 12, 2016. Ex. 1 at 37. Ms. Cross adjusted that property for its listing status, its smaller size (which might result in larger increments of value), and superior zoning, as well as its inferior frontage and inferior access. *Id.* at 48. Comparable number 2 is a sale of property in Swansboro that closed on June 8, 2016 and is planned for a 125 lot subdivision. *Id.* at 39-40. Comparable number 3 is a tract of land in Richlands that sold on July 8, 2014 to a local farmer for agricultural purposes. *Id.* at 41-42. Comparable number 4 is a sale of property in Hubert, Onslow County, which closed on February 3, 2014, at a time when it was permitted for 16 single-family lots. *Id.* at 43-44. Comparable number 5 is a sale of property near New Bern that closed on July 31, 2013 to be developed as a subdivision. Comparables 2-5 were all adjusted for superior location, and Comparables 2 and 3 were adjusted for superior availability of utilities. *Id.* at 48.

Ms. Cross placed the most weight on Comparables 1, 3, and 5, and reached a price per acre of $10,000. As a result, she determined the rounded value of the "excess land" to be $620,000. Ex. 1 at 50. Based on her separate values for the 31 lots and the "excess land," Ms. Cross concluded the value of the Property as follows:

> Sales comparison for excess land: $620,000
> Income approach for value of lots $515,000
> **Total: $1,135,000**

Ex. 1 at 65.[4]

Ms. Cross next testified about her second appraisal, Exhibit 2. As noted above, that appraisal was tendered to support her conclusion that residential development is the highest and best use for the Property, as she reached a substantially higher value for the Property once completed. Of note in Exhibit 2 is her "as is" value of the vacant land at $820,000 (based on the $10,000 per acre in Exhibit 1), which she used as a starting point for her cost approach analysis. Unlike the appraisal in Exhibit 1, which values raw land and platted lots separately, Exhibit 2 reflects the entire tract (minus the wetlands) as raw land first and then the 139 lots in the future separately.

On cross-examination, Ms. Cross admitted that she had not spoken to any developers who would be interested in developing the Property, nor did she allocate any time for permitting, construction, or development of infrastructure necessary to bring the lots onto the market when estimating her absorption rate for the 31 lots. Further, she did not account for the costs of development or permitting, contending that for the 31 lots nothing needed to be done to sell the lots. In addition, she did not cite any independent studies for expected growth and development to support the Jacksonville/Camp Lejeune housing market reaching into Jones County in the foreseeable future.

**Mr. Wiggins**

Mr. Wiggins, who owns the Property, testified that he is currently using about 80 acres of the Property for row cropping. He readily acknowledged that the wetlands located in the rear section of the Property are not farmable. He further testified that while some of his other farming

---

[4] Ms. Cross attributed no value to the wetlands portion of the Property.

operations pertain to poultry production, the Property has never been used for poultry production and cannot be used for that direct purpose. Specifically, chicken houses must be a certain distance from residential property, schools, public businesses, and state roads. Further, neighbors would have to agree to the installation of chicken houses on the Property, a very unlikely event. Finally, Case Farms, Inc. (or some other major poultry producer) would have to be involved in building new chicken houses, and it now prefers to install a minimum of four houses on any property. Those hypothetical houses would be extremely large and would cost an estimated $2.4 million to build. In short, if the Property is to continue in agricultural use, it can only be farmed for row crop production and not for poultry production.

Mr. Wiggins further testified that he believed the Property can be developed as a residential subdivision based on his history selling lots to American Homesmith. The current six homes on the lots sold to American Homesmith are served by Jones County water and county water would be available to the remaining 31 road frontage lots upon water line extensions. Currently, water line tap hookups are available from the county for $1,500 per meter. Mr. Wiggins did admit that the First Plan as confirmed in the Prior Case required the Debtors to market the Property, and that individual lots did not sell.

**Mrs. Wiggins**

Mrs. Wiggins also testified that the confirmed plan in the Prior Case required the Debtors to market the Property, and that while the Property was listed, no offers were received. She did not recall for how long the Property was listed.

**Earl M. Worsley, Jr., MAI**

Earl M. Worsley, Jr. is an MAI-certified licensed real estate appraiser and his testimony was presented by CFC. The parties stipulated that he is an expert in the field of real estate valuation.

13

Dkt. 221 at 14, ¶ 19. Mr. Worsley prepared an appraisal report of the Property dated June 6, 2017, Exhibit 3. He described the immediate area surrounding the Property as 9-10 miles from Trenton, 8-10 miles from Richlands, and surrounded by timber tracts, chicken production, and scattered dwellings. He testified that it was not a high density population area, there is little commercial use, and he disagreed with Ms. Cross's opinion that it was a gentrifying mixed-use area. He further testified that while the population was growing in neighboring counties closer to the coast, the population in Jones County is declining.

Mr. Worsley's analysis of the highest and best use for the Property appears at pages 28-30 of Exhibit 3. He determined that from a physical standpoint, the Property could reasonably accommodate a variety of agricultural uses, and from a legally permissible standpoint, a number of uses including agricultural and residential are permitted. Ex. 3 at 29. In assessing what use is financially feasible and maximally productive, Mr. Worsely noted that he conducted some research regarding the feasibility of residential development because he had been provided with a site plan for 137 single-family lots. Based on his discussions with county officials and from his inspection of the public records in Jones County and neighboring counties, he found the following:

- From July 1, 2014 to June 30, 2015, there were 101 total building permits issued in Jones County. From July 1, 2015 to June 30, 2016, there were 70 total building permits issued. From July 1, 2016 to the date of the report, June 6, 2017, there were 77 total building permits issued. He could not obtain a breakdown of how many of those permits were for residential new construction, but he was told by an inspector in Jones County that approximately 10-20 new single family homes are constructed per year in Jones County.
- In Onslow County, there have been 145-203 residential new permits issued per quarter over the past three quarters for a total of 509 residential new permits, for a pace of 679 residential new permits from July 1, 2016 to June 1, 2017.
- In Craven County, 139 new single family dwelling building permits were issued in 2015 and 177 new single family dwelling building permits were issued in 2016.
- There have been 13 vacant lots sold in Jones County under 1.5 acres in the 12 months prior to June 2017, and 5 lots sold in Jones County under 1.5 acres from July 1, 2016 to June 1, 2017.

14

- There are 43 single family residences currently on the market, with 5 new construction homes just south of New Bern. Ten more lots within that neighborhood were soon to reach the market, but there had been no sales in that neighborhood to date.
- In Onslow County, 3,160 single family residences were sold over the 12 months prior to the report, 640 of which were new construction.
- In Craven County, 1,425 single family residences were sold over the 12 months prior to the report, 138 of which were new construction.

Ex. 3 at 29-30.

Based on this information and discussions with local real estate brokers, Mr. Worsley determined only a limited demand for single family homes and lots in Jones County currently exists, such that comprehensive development of the Property for residential use is not feasible at this time. *Id.* at 30. He further noted that "there is still a significant amount of vacant land available for development in Onslow County within close proximity to Jacksonville." *Id*. Mr. Worsley also testified that he looked at a number of other rural counties in North Carolina that are similar to Jones in being adjacent to growing counties to determine if such comparable rural counties are benefitting from the growth of their neighbors, and he determined that largely they are not.

Having concluded that residential development is not presently financial feasible, and would not be so in the near-future, Mr. Worsley determined that the highest and best use of the Property is agricultural use. Accordingly, he arrived at his estimated value of the Property through the comparison of sales of other and similar near-by agricultural tracts. Specifically, Mr. Worsley considered five land sales: Comparable number 1 is a 120.83 acre property in Duplin County that sold in March 2012. Ex. 3 at 32. Comparable number 2 is a 109.70 acre property in Duplin County that sold in January 2013. *Id.* Comparable number 3 is a 33.85 acre parcel in Jones County 13 miles from the Property that sold in October 2014. *Id.* Comparable number 4 is a 113.47 acre parcel in Jones County 12 miles from the Property that sold in July 2014. *Id.* Comparable number 5 is a 77.63 acre parcel in Jones County 13 miles from the Property that sold in April 2015. *Id.*

15

After making adjustments to Comparables numbers 3-5 for topography and access, Mr. Worsley adopted a land value of $3,850 per acre, and applied that value to the entire 101.26 acres for a rounded market value of $390,000.

On cross-examination, Mr. Worsley testified that in preparing his analysis he did not have the plat showing the 31 lots, but that he would not consider the fact that a plat has preliminary approval or has been recorded to be an "improvement." Given his conclusions about the current lack of a market for a housing subdivision development in the area, he did not further assess whether developing the 31-lot subdivision would be feasible at this time, but also maintained that his analysis is the same for any sized hypothetical development of the Property, whether for 31 lots or 137. With respect to his sales comparisons, Mr. Worsley acknowledged that he did not include the sale of nearly 1000 acres of farmland and woodland in Jones and Lenoir Counties that closed in January 2016 (the "Pinecrest Sale"). *See* Ex. 14.

**Jack C. Morgan III, MAI, SRA, AI-GRS, R/W-AC**

Jack C. Morgan III is an MAI-certified appraiser. He was engaged in this matter to conduct an "appraisal review," to "provide an opinion as to which appraisal report provides the most credible opinion of Market Value." Ex. 4 at 1. Mr. Morgan spends approximately one-half of his time reviewing the appraisal reports of other appraisers, primarily to determine the credibility level of appraisals on behalf of lenders. Mr. Morgan compared Mr. Worsley's appraisal report, Exhibit 3, with Ms. Cross's second appraisal report, Exhibit 2. Mr. Morgan later also prepared a review of Ms. Cross's first report, Exhibit 1. *See* Ex. 5.

As it relates to the court's determination herein, Mr. Morgan noted that the first item for review is the highest and best use analysis, because if the incorrect highest and best use is identified, then the remainder of the appraisal is flawed. Mr. Morgan also testified that in choosing

16

comparable properties, it is important to choose some that are superior and others that are inferior in order to establish a ceiling and a floor.

Mr. Morgan was critical of Ms. Cross's methodology; however, as noted below, the court has limited its discussion of and gives limited weight to Mr. Morgan's testimony and report because, while they serve to verify some of the court's own determinations of the credibility of Ms. Cross's report, they are largely duplicative.

**John L. Pierce, PLS**

John L. Pierce, PLS, is a land surveyor and developer in the Onslow County area. He testified with respect to his personal experience and development projects in the areas of Jacksonville, Sneads Ferry, Swansboro, Hubert, and Richlands. Mr. Pierce noted that Onslow County had been shielded from the national real estate slowdown in 2009 because the United States Marine Corps moved up to 202,000 troops and their families to Camp Lejeune, but the military has since pulled back on those relocations and the market seems to have slowed down. As a result, his strategy is to develop where he knows there is good demand, including Sneads Ferry, Hubert, and similar areas that are close to the coast and to the Marine Corps base.

Mr. Pierce noted that the Property is approximately 30 miles from Camp Lejeune. There is an incomplete subdivision near the Property, Stallion Acres, that Mr. Pierce was offered the opportunity to purchase and complete just prior to the hearing of this matter. He declined, because he does not believe there is enough demand to make a profit after building the remaining infrastructure. Instead, he purchased an incomplete subdivision in Richlands.

Mr. Pierce also reviewed the comparable properties employed by Ms. Cross in her appraisal, noting that he was the buyer of Comparables numbers 2 and 4 (the properties in Swansboro and Hubert), and that he had been offered Comparable number 1 (the listed property

17

near the Property) and chose not to purchase it. Mr. Pierce testified that he would not purchase the Property for the same price he paid for either of the comparable properties. He noted that Comparable number 4 was a planned subdivision with all engineering permits in place, and it is only two miles from the back gate of Camp Lejeune.

On cross-examination, Mr. Pierce admitted that he had never developed property in Jones County.

## ANALYSIS

Ms. Cross is a respected appraiser who has testified credibly and persuasively in other cases in this district. However, in this case the court finds that she missed the mark on the highest and best use for the Property. First, she defined the market area for the Property as southern Jones County and Northern Onslow County, relying largely on the military population as the likely buyers for residential development. However, she stopped there and did not show the Property was close enough to the gate at Camp Lejeune to appeal to military families given the wide availability of current housing in or near Richlands and other areas much closer to the base. Further, the comparable sales relied upon by Ms. Cross were not convincingly comparable. All of her comparable subdivisions have completed construction of infrastructure and interior roadways – which she maintained would greatly appeal to military families. The 31 proposed lots on the Property are road frontage lots with no infrastructure and no amenities and by Ms. Cross's logic would not likely appeal to military families. In addition, the comparable properties were all superior to the Property, such that no "floor" could be established.

With respect to the income approach, Ms. Cross's absorption rates are unreliable, as they do not clearly delineate between lots sold to a builder and completed lots then sold to a buyer, such that her relied upon comparable sales fail to account for the some of the same lots being sold twice.

Further, she predicted that half of the lots on the Property would be sold in one year, which simply does not line up with the market conditions contained within her report. Indeed, the evidence showed that property simply has not been selling in the nearest subdivision, Stallion Acres, which was not one of Ms. Cross's comparables, nor have the two remaining lots on the Property sold since the First Plan was confirmed.

Mr. Worsley, on the other hand, appropriately identified the highest and best use of the majority of the Property as agricultural. As described further below, however, the court also has some criticism of his conclusions and does not adopt his appraised value wholecloth. Finally, the court gives some but not great weight to the report and testimony of Mr. Morgan, as they further support the conclusions reached independently by the court with respect to the relative merits and faults of the Cross and Worsley reports.

## FINDINGS AND CONCLUSIONS

The evidence presented at trial showed three potential categories of actual or highest use within the 101.26 acres at issue: (1) agricultural; (2) residential; and (3) wetlands. The parties acknowledged at trial that about sixteen acres of wetlands existed on the eastern side of the property that could not be used for farmland or residential purposes. Neither party submitted any evidence of marketable timber existing on the wetlands. As discussed above, the Debtors were unable to show that either a 139 residential development with interior lots in a planned subdivision as described in Exhibit 2 could be marketed and sold in Jones County within a reasonable time, or that an alternative less ambitious 31 lot "roadside cutout" subdivision as contemplated in Exhibit 1 was reasonably achievable for valuation purposes. Therefore, the court finds that for the bulk of the Property, agricultural purposes are the current highest and best use of the land. However,

19

multiplying the number of acres by an agricultural value will not suffice, as several further factors affect the final valuation in this case.

Mr. Worsley concluded in his appraisal report that the present value for farmland in Jones County is $3,850 per acre based on four of five identified comparison farmland sales occurring within a sixty or seventy mile radius of the subject property. Ex. 3. He valued all of the property (101.26 acres) as farmland for a total rounded value of $390,000. Pursuant to *In re Fazekas*, Case No. 92-02262-8-JRL (Bankr. E.D.N.C. May 17, 1993),[5] CFS requested that the amount be discounted for projected sale and carrying costs as well.

However, Mr. Worsley's stated valuation is not absolutely accurate for several reasons. First, two of his comparison sales are from 2012 and 2013, and farmland prices in the Jones County area have risen at least a modest amount in the ensuing five years as the general economy in eastern North Carolina has improved, and well-run farms continue to be profitable. In addition, Mr. Worsely's identified comparisons are not complete as they exclude other sales such as the Pinecrest Sale, nearly one thousand acres of relatively near-by farmland and woodland that included eight tracts located in Jones County and adjoining Lenoir County as reflected in a deed recorded January 20, 2016. *See* Ex. 14. The failure to assess such a recent sale draws scrutiny to the four sales Mr. Worsley ultimately relies upon. Drawing upon other sales of farmland and adjusting for the remoteness in time leads the court to conclude that a fair price for farmland in Jones County in this case is $4,100 per acre.

---

[5] *Fazekas* is one of the first dirt-for-debt cases in this district. In *Fazekas*, the court relied on a three-step valuation process. *Fazekas*, slip op. at 7. First, the court determined the present fair market value for each property. Next, the fair market value was reduced by 10% in recognition of the sales commission typically charged by real estate brokers in the district, which the creditor would likely incur upon sale of a property. *Fazekas*, slip op. at 7. Last, the court applied a discount rate to the net value of each property to "reflect costs associated with [the creditor's] loss of the use of its money during the time the properties remain unsold." *Fazekas*, slip op. at 8.

Mr. Worsley also fails to take into account the undisputed fact that no crops could be grown (or houses built for that matter) on the approximately sixteen acres of wetlands contained within the Property. From numerous other sales held in this court that include wetlands in eastern North Carolina and without taking merchantable timber into account due to lack of evidence, the court observes that wetlands tend to bring $700 to $900 per acre. The court will therefore value the wetlands at an average of $800 per acre.

Finally, the court would be remiss were it to ignore the actual lot sales history of the Property and the inexorable encroachment of housing inland from Jacksonville and the coast, even though the bulk of the coastal buildout is currently estimated at ten miles and maybe ten years away. The plat contained in Exhibit 1 has been tentatively approved by Jones County (although apparently not rendered in a final recording) to reflect 31 roadside, non-interior lots consisting of at an average about 0.35 of an acre each. Mr. Pierce's testimony showed that a market for a subdivision of around thirty residential lots in Jones County does not presently exist. However, the Debtors sold six cut-out lots in the past few years, and the testimony of both CFS's expert witnesses and Ms. Cross agreed that the last two years of sales in adjacent Onslow County emanating from Jacksonville towards Richlands (about ten miles from the Property) reflect a rebounding general housing market. Ms. Cross's testimony projected that some spillover effect from Onslow to Jones is warranted, albeit not the thirty plus lots she advocated. Given that six lots were sold previously, it stands to reason that another six roadside lots could be sold in the next three to five years.

With respect to a present value for the lots, no competent evidence was presented by either party. Consequently, the six historical lot sales of $22,500 each is the best starting point. Homes were built on each lot and sold to consumers. All six homes were tapped into and are served by

the Jones County treated water system at tap fees of $500 each.[6] Testimony was given that the waterlines from those homes must be extended upon future road front lot sales, and that the county's tap fee has now increased to $1,500 per lot. Tap fees are generally a development cost passed to the residents, so an increase in tap fees would likely require a reduction in the net to lots sellable in the near future.

A discount for the three years (at least) that historically would be required to sell those lots must also be reflected under the *Fazekas* factors to reflect carrying costs such as ad valorem taxes, maintenance, risk and realtor fees upon sale. Over three years, at two lot sales per year the discount incurred would result in the following:

| sales price | lots sold | net value |
|---|---|---|
| $ 21,500.00 | 2 | $   43,000.00 |
| $ 19,350.00 | 2 | $   38,700.00 |
| $ 17,415.00 | 2 | $   34,930.00 |
| **Total** | | **$ 116,630.00** |

At the 0.35 acre per lot average, six lots equal 2.1 acres, which when added to the sixteen wetland acres totals 18.1 acres. Deducting this amount from the aggregate 101.26 acres leaves farmland of 83.16 acres. At a per acre value of $4,100, the total farmland value is $340,956. The sixteen acres of wetlands at $800 per acre yields $12,800. When added to the farmland, the rounded farmlands/wetlands combined value is $353,756. A one-time reduction of seven percent for present year carrying and future sale costs is in order (the farm land can be rented to cover future year tax and insurance costs), leaving a net present value of $328,993. Adding the six lot net total

---

[6] No sewer service is available so each lot must have a septic tank, which is another strike against a pipedream 137 lot subdivision.

from the table above results in an aggregate present value of $445,293, which the court rounds to $445,000.

## CONCLUSION

Based on the foregoing, the court finds that the value of the Property to be surrendered to CFS has a value of $445,000, be credited against the claim filed by CFS in this case upon plan confirmation and surrender of the Property.

**END OF DOCUMENT**